## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | |
|---|---|
| TAMMY FLOREA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case No. 2:11CV17 AGF |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This matter is before the Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Tammy Florea, was not disabled

and, thus, not entitled to disability insurance benefits or to supplemental security income

("SSI"), under Titles II and XVI of the Social Security Act, respectively, 42 U.S.C. §§

401-434 and §§ 1381-1383(f).  For the reasons set forth below, the decision of the

Commissioner shall be affirmed.

Plaintiff, who was born on September 28, 1965, filed her applications for benefits

on September 24, 2007, four days before her forty-second birthday, alleging a disability

onset date of August 30, 2007, due to blood clots in her legs, varicose veins, and right leg

numbness.  In a revised application, Plaintiff also claimed disability due to a history of

thrombophlebitis, degenerative disc disease in the lumbar spine, obesity, depression,

asthma, headaches, and carpal tunnel syndrome.[1]  After Plaintiff's applications were

denied at the initial administrative level, Plaintiff requested a hearing before an

Administrative Law Judge ("ALJ"), which was held on April 13, 2009.  Plaintiff and a

vocational expert ("VE") testified at the hearing.  In his June 26, 2009 decision, the ALJ

found that Plaintiff had the residual functional capacity ("RFC") to perform certain jobs

identified by the VE.  The Appeals Council of the Social Security Administration denied

Plaintiff's request for review on December 28, 2010.  Plaintiff has thus exhausted all

administrative remedies and the ALJ's decision stands as the final agency action now

under review.

Plaintiff now asserts that the ALJ's decision is not supported by substantial

evidence on the record as a whole and that the ALJ committed reversible error by

discrediting Plaintiff's testimony; by failing to consider the written testimony of

Plaintiff's daughter; failing to give proper weight to the effect of Plaintiff's obesity on her

ability to work; rejecting the conclusions of a consulting physician, including his global

assessment of functioning ("GAF")[2] determination of 50; and by rejecting the VE's

---

[1]  In her original Report, Plaintiff stated that she took medication for depression related to her blood clots.  Plaintiff also complained of depression in her Work History Report and Appellate Report.  However, Plaintiff did not allege that the depression interfered with her ability to work.  Most of the other claims are mentioned in the hearing testimony, but not in her applications.  (Tr. 145, 160, 164.)

[2]  A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "[s]ome impairment

testimony that Plaintiff would be unemployable. Plaintiff asks that the Court reverse the decision of the Commissioner and grant immediate benefits without remanding to the ALJ, or, in the alternative, remand for reevaluation of the evidence and further development of the record.

## BACKGROUND

### Work History and Application Forms

On September 24, 2007, Plaintiff filed two applications: an application for disability insurance benefits ("DIB") and an application for supplemental security income ("SSI"),[3] asserting disability due to "blood clots in [her] legs, varicose veins, [and] right leg numbness."[4] Plaintiff reported recurring episodes of clotting, numbness in her right leg from the thigh to the knee, bad pain, and swelling, that caused difficulty standing, sitting, and the need to prop her legs up. In a later revised application for DIB, Plaintiff also asserted ongoing symptoms of carpal tunnel syndrome. (Tr. 131, 146, 153.)

---

in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment. *Cox v. Astrue*, 495 F.3d 614, 620 n. 5 (8th Cir. 2007); *see also Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (GAF score of 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life, and . . . the VE considered a claimant with a GAF of 50 unable to find any work").

[3] The Field Office Disability Report, dated September 24, 2007, noted that Plaintiff applied for benefits in 1996 but was denied. (Tr. 126.)

[4] The Disability Determinations System Case Activities sheet, completed on October 19, 2007, listed these as Plaintiff's only allegations. (Tr. 154.)

In the Disability Report and in her Work History Report, dated September 28, 2007,[5] Plaintiff stated that she worked as a pharmacy tech from 1999 until her alleged disability onset date of August 30, 2007. In addition, Plaintiff worked intermittently from 1994 to 2001 as a convenience store cashier; from 1998 to 2001 as a phone surveyor for a telemarketer, for approximately six months in 1999, as a grocery store clerk; and from 1989 to 1994 as a machine operator for a shoe manufacturer. Plaintiff also reported that at "[t]he last jobs" she "operated sewing machines[,] a sealer[,] and printer." Plaintiff's earnings varied over the last 10 years of her work experience, but the record indicates that Plaintiff earned approximately $20,000 per year as a pharmacy tech. (Tr. 116.)

In the September 28, 2007 Function Report, Plaintiff wrote that she took care of her children, which included cooking, housework, and doing at least one load of laundry a day. She also reported that she could drive a car, go out alone, and handle the finances. Plaintiff claimed that she could lift twenty pounds or less, that the blood clots in her legs hurt when squatting, kneeling, or climbing stairs, and that standing and walking caused her legs to ache and swell. Plaintiff further reported that she had not noticed any unusual behavior or fears, but didn't handle stress well. Plaintiff also reported that she took medication for depression related to her blood clots, but did not allege that depression interfered with her ability to work. (Tr. 138-45.)

---

[5] Different dates appear in Plaintiff's Work History Report. But as these dates are not at issue in the case, only the dates first given in Plaintiff's September 24, 2007 Disability Report – Adult are given here. (Tr. 131, 146.)

In the undated Disability Report included in the record, Plaintiff asserted that she had not worked at any time after the alleged disability onset date of August 30, 2007, stated that she stopped working because she had a baby, and did not note any physical or mental impairments as the cause.  (Tr. 130.)

In the undated Disability Report-Appeal, Plaintiff reported her conditions changed on October 15, 2007, stating that she had more pain in her legs and that she was "very depressed."  She cited no new physical or mental limitations or conditions, but reported seeking medical care for infection from an incision, "depression/nerves," counseling, an MRI, and for surgery to treat the blood clots in her legs.   (Tr. 160-62, 164.)

On December 18, 2008, as part of the administrative reconsideration process, Plaintiff completed a Function Report stating she could lift five to six pounds, walk less than a quarter mile before needing to rest for at least ten or fifteen minutes, and pay attention for thirty to forty-five minutes before needing to move.  Plaintiff further stated that her hands would go numb, that she had trouble sitting or standing for long periods of time, and that she was "very depressed" because of her limitations.  (Tr. 177-78, 180.)

### Medical Record

 On September 15, 2006, while working as a certified pharmacy tech, Plaintiff sought medical evaluation and treatment from John G. Adams Jr., M.D., a physician at the Institute for Outpatient Surgery, who assessed left lower extremity superficial venous insufficiency with painful varicosities and recommended stab avulsion microphlebectomy, a surgical procedure that was performed on September 15, 2006.  A

follow-up assessment, one month later, revealed Plaintiff was doing well and had no complaints. On June 11, 2007, however, Dr. Adams diagnosed Plaintiff with painful telangiectasia,[6] which he characterized as common condition in pregnancy. Dr. Adams recommended compression therapy and post-pregnancy follow-up. On August 31, 2007, Plaintiff gave birth. (Tr. 269-75.)

On September 6, 2007, Charles L. Pritchard, D.O., a physician in the cardiovascular department of the Northeast Regional Medical Center, performed a Venous Doppler and diagnosed Plaintiff with superficial thrombophlebitis in her left leg. (Tr. 277.) On September 11, 2007, Melanie Grgurich, D.O., Plaintiff's primary care physician, prescribed Prozac for Plaintiff, and noted two weeks later, that Plaintiff refused counseling. (Tr. 330-31.)

On September 28, 2007, Plaintiff saw Kent J. Blanke, D.O., a cardiovascular-thoracic surgeon, who reported "continued problems with [Plaintiff's] known venous insufficiency, [and] varicosities[,] . . ." for which he recommended phlebectomy and continued compression hose treatment. (Tr. 334.) Although the record is somewhat unclear, it appears that the recommended phlebectomy was performed in late October 2007.[7]

---

[6]  Telangiectasia: an abnormal dilation of capillary vessels and arterioles that often forms an angioma. *Merriam-Webster's Collegiate Dictionary* 1211 (10th ed. 1993).

[7]  The procedure is mentioned in Wound Treatment notes dated December 13, 2007, although the record contains no other medical evidence that the phlebectomy was

On October 22, 2007, Plaintiff had an MRI that revealed disc degeneration in L5-S1, herniation that did not efface the nerve, and a facet arthritic change at L5-S1 and L4-5. Examining Plaintiff on December 13, 2007, Dr. Blanke reported that the area where the phlebectomy had been performed was much improved, but he encouraged Plaintiff to call him if the situation worsened. Plaintiff did not call and did not see Dr. Blanke during 2008. Plaintiff continued to see Dr. Grgurich through 2008, who noted on January 8, 2008, that Plaintiff had full strength in her extremities, and on April 28, 2008, that she had full range of motion. (Tr. 185, 269-72, 277, 280, 330-31, 334, 342, 345, 349, 351, 362, 371.)

Plaintiff eventually agreed to receive counseling and on December 10, 2007, Nathan Mozingo, LPC, evaluated Plaintiff for depression and anxiety. She reported that she had been depressed most of her life, even during her academic years, and that she had recently experienced "increas[ed] anxiety and worry as she ha[d] to cope with losing her job." Mr. Mozingo noted that Plaintiff had been taking Prozac since September of 2007, and that it seemed to improver her mood.[8] Plaintiff continued to see Mr. Mozingo for

---

performed. The Disability Determinations System Case Activities report references a conversation with Plaintiff on October 19, 2007, in which she stated that the phlebectomy was scheduled for October 31, 2007. Notes from Dr. Grgurich dated October 30, 2007 and then December 7, 2007, make no reference to phlebectomy. (Tr. 351, 154, 377.)

[8]     At this evaluation, Plaintiff reported that after she lost her job as a pharmacy tech, her previous employer offered her "an option of doing part-time checking at a lower salary." Plaintiff declined this offer and began looking for other work, a search that was ultimately unsuccessful. (Tr. 353.)

individual therapy through at least 2008. Her chief complaints related to anxiety over her job loss and relationship problems with her boyfriend. (Tr. 353-61.)

On December 23, 2008, Plaintiff was referred to Jeffrey Harden, D.O., for a consultative mental status examination as part of her application for benefits. Plaintiff reported a long history of depression going back at least twenty years. Plaintiff also indicated that she was able to perform a substantial number of activities of daily living. For example, she drove, did some cooking, managed her budget and medications, and had appropriate hygiene. Dr. Harden observed that Plaintiff had satisfactory grooming; logical thought processes; intact concentration; and was fully oriented to person, place, and time. He further noted the absence of hallucinations, delusions, and suicidal thoughts. Dr. Harden concluded that Plaintiff had major depressive disorder and posttraumatic stress disorder, both of which had been inadequately treated, and assigned her a GAF of 50. He recommended ongoing psychiatric care with further medication and counseling. (Tr. 386-88.)

On March 2, 2009, Plaintiff saw Niranjan Narain Singh, M.D., to whom she had been referred by her primary care physician. Dr. Singh performed an EMG which showed that Plaintiff had moderate carpal tunnel syndrome, but no evidence of cervical radiculopathy or ulnar neuropathy. Dr. Singh recommended that Plaintiff wear a splint. (Tr. 395-96.)

**Evidentiary Hearing on April 13, 2009** (Tr. 20-57)

At the evidentiary hearing on April 13, 2009, Plaintiff testified that she was forty-three years old, had graduated from twelfth grade, and was living at home with her four-year-old daughter and nineteen-month-old son. Plaintiff testified that she had most recently worked at Walmart as a pharmacy technician. She held this position for four years and had last worked the day before her son's birth, on August 30, 2007. Plaintiff stated she tried to get her job back after her son's birth but had a problem with the pharmacy manager, did not file unemployment, and looked for work unsuccessfully for five or six months. Plaintiff further testified that, at the time of the hearing, she could not work because she had a herniated disc in her back, recurring superficial blood clots in her legs that required her to elevate them, trouble with depression and anxiety, and carpal tunnel syndrome for which she wore a brace every night. (Tr. 25-26.)

Plaintiff claimed she could not bend for long periods of time and that lifting was very difficult for her because of her back problems. Plaintiff reported an MRI had been performed in October 2007. The ALJ asked whether, since the back injury had no effect on her nerves, it would affect her ability to bend "or anything of that nature." Plaintiff responded that she "had no idea." Plaintiff indicated that she had thrombophlebitis on and off all the time, requiring elevation of her legs. (Tr. 27-28.)

Regarding daily activities, Plaintiff testified that she was the primary care giver for her children and had no problems taking care of them and doing normal things around the house such as cooking. Plaintiff also testified that her twenty-one year old daughter

helped her with the laundry and shopping.  Plaintiff also testified that others took her children to doctor's appointments.  Plaintiff stated that she did some driving and could walk about a block, but had pain standing or sitting, each of which she could only do for twenty-five or thirty minutes before having to change position.  Plaintiff testified that she could lift no more than a gallon of milk and never picked up her son because he can "crawl up on my lap.  We have it so that he can get in and out by himself."  (Tr. 28-30.)

Regarding her mental health issues, Plaintiff testified that she had taken Prozac that worked initially, but now took Cymbalta, which she found helpful.  Plaintiff further testified that she saw a counselor approximately once a week.  Plaintiff claimed that she cried a lot, had anxiety and panic attacks, and had racing thoughts about things she could no longer do.  (Tr. 28-31.)

Plaintiff  testified that she weighed about 248 pounds at the time of the hearing. At this point, Plaintiff's attorney interjected, stating that the record contained evidence that Plaintiff had a BMI of 40.  (Tr. 31-32.)

Upon questioning by her attorney, Plaintiff testified that in the last year she had experienced headaches four to five times a week, lasting four to five hours each.  Plaintiff stated that she took ibuprofen for the headaches, and that they caused light sensitivity and required her to "just go to bed until it subsides."  Plaintiff testified that the headaches had only begun occurring at that intensity within the last year.

Plaintiff then testified that she had had carpal tunnel syndrome for approximately two years and that it affected her ability to hold things and made her drop things.

Plaintiff further testified that numbness in her hands due to carpal tunnel syndrome awakened her two or three times a night, and that, in 2004, she fractured her left wrist, which still swells and throbs.

Plaintiff also testified that she had bad stomach problems such that about six months ago, she began to vomit eight to twelve times a week. She stated that she could not identify a change or condition that caused the vomitting. (Tr. 33-35.)

Plaintiff next stated that she had numbness in her right leg from her hip to her knee, which doctors attributed to a pinched nerve. She also testified that she had blood clots and varicose veins in her left leg, requiring elevation of that leg for most of the day. Plaintiff further testified that she experienced clotting in her legs for fourteen to twenty days out of a month. Plaintiff also testified that, from August 30, 2007, the alleged disability onset date, until twelve months before the hearing, the clotting occurred less frequently, about once a month, but that sometimes it lasted longer than seven to ten days. Plaintiff stated that when she had clots in her legs, she had to sit with her legs elevated, on the couch or in a recliner, for at least eight hours. Plaintiff stated that the blood clots could be triggered if she bumped or hit her leg and that they were very painful, causing a burning sensation and pain when touched or bumped. (Tr. 35-37.)

Plaintiff then testified that she had broken her right ankle in 1994 or 1995 and had to have two screws inserted in the bone. Plaintiff claimed her ankle still "gave out" on her sometimes and swelled five to six times every day, requiring elevation for thirty minutes. Plaintiff testified that the swelling began when she broke it and that when she

was at work she had to elevate her foot on a "box or something." (Tr. 38-39.)

Plaintiff testified that beginning about two years ago, for no particular reason that she could identify, her depression made her cry for four to five hours every day. Plaintiff also testified that some days she would not get dressed, that she would stay in her night clothes three days a week, and that more than twice a week she remained in bed all day because she would "just [not] feel like doing anything."

Plaintiff stated that her sleep pattern was very interrupted, that she could not sleep through the night, and awakened "every hour on the hour" about five or six times a night. Plaintiff testified that panic attacks and nightmares of someone chasing her and trying to kill her children awakened her three to four times a week. Plaintiff testified that during her panic attacks, which occurred two or three times a week, and without any obvious trigger, she could not breathe, would have chest pains and would "get really scared." Plaintiff further testified that she had had panic attacks for six months and that the Cymbalta made them milder, reducing the chest pains. Plaintiff also testified that she had difficulty falling asleep and would lay awake with racing thoughts about things she could not do, things she wished she could do, and things she wanted to do. Plaintiff further testified that she did not sleep during the day unless she had a headache. (Tr. 39-41.)

Plaintiff testified that she did not like being around crowds and that they scared her because she "did [not] know what they [were] saying about [her]." Plaintiff testified that this fear prevented her from going out, but that when she would leave her house, she would usually be gone all day but not stay overnight anywhere. Plaintiff claimed she

12

only left her house once a month, usually accompanied by her daughter, so that she could return home if she got sick.  Plaintiff testified that she did not drive far because driving scared her.  (Tr. 41-43.)

Upon questioning by her attorney, Plaintiff stated that her father, daughter and cousin helped her around the house with tasks such as lifting, laundry, vacuuming and outside work.  Plaintiff testified that her father, in particular, would come over every day for at least two or three hours to help with her children.  Plaintiff's attorney reminded her that earlier she had testified that she had no trouble caring for her children.  In response, Plaintiff stated she could not lift her son or get on the floor to play with him, but that was her only problem.  Upon further questioning, Plaintiff stated that her father watched her children when she had a bad headache, as she often did two or three times a week for three or four hours, but that she did not consider this a problem taking care of her children.  (Tr. 44-46.)

In response to the VE's request for additional information regarding an exhibit referring to a job where Plaintiff operated a sewing machine,  Plaintiff testified that she had been a sewing machine operator and a sealer at a glove factory for approximately a year beginning in 1996, and that neither position required heavy lifting but did require part time standing.  The VE then asked Plaintiff some additional questions about her work history.[9]  (Tr. 47-50.)

---

[9] None of these aspects of Plaintiff's work history are at issue here.

The ALJ then asked the VE to classify Plaintiff's past work experience. Given the variety of positions Plaintiff had held, the VE stated that she had worked at various levels, including light and unskilled, light and semi-skilled, medium and unskilled, and medium and semi-skilled. The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education level, and past work experience limited to performing light exertional level work. The ALJ further specified that the individual could never climb ropes, ladders, or scaffolds, could occasionally climb stairs and ramps, and was limited to frequent, but not constant, fine manipulation or "fingering." The ALJ added that the individual should avoid concentrated exposure to unprotected heights, excessive vibration, hazardous machinery, and was limited to performing unskilled work only, requiring no more than occasional contact with the general public.

The VE opined that such an individual could not do any of Plaintiff's past relevant work, but that there would be other jobs at the light and unskilled level in the national regional economy, such as bench assembly, children's attendant, or office helper that such an individual could perform. (Tr. 50-51.)

The ALJ next asked the VE to consider a second hypothetical individual restricted to sedentary work that would allow the individual to alternate between sitting and standing every thirty minutes, but still work a full eight hour day. He posited that this individual could occasionally climb stairs and ramps, but never climb ropes, ladders or scaffolds, could occasionally stoop, kneel, crouch and crawl, with the remaining non-exertional limitations as the first hypothetical individual.

14

The VE testified that such an individual could not perform any of Plaintiff's past relevant work, but that other jobs suitable for such an individual existed in plentiful numbers in the national economy, for example, the assembly, packaging, or stuffing of smaller items like cosmetics, pharmaceuticals, and toys.  (Tr. 52-53.)

The ALJ then asked the VE to consider a third hypothetical individual with the same non-exertional limitations as the second individual, but requiring occasional unscheduled disruptions of the workday and workweek secondary to the effects of medication, the need to lay down for extended periods of time and potential periods of decompensation.  The VE responded that there would be no jobs in the national economy for such an individual.[10]  (Tr. 53.)

**ALJ's Decision of June 26, 2009 (Tr. 5-19)**

The ALJ first found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2011, and had not engaged in substantial gainful activity since August 30, 2007, the alleged onset date.  He further determined that Plaintiff had the following "severe" impairments: a history of phlebitis, degenerative disc disease of the lumbar spine, obesity, depression, and carpal tunnel syndrome.  The ALJ found, however, that none of Plaintiff's impairments, alone or in combination, met the

---

[10]     Plaintiff's attorney then requested a psychiatric evaluation, which the ALJ pointed out had already occurred on December 23, 2008, and had been submitted as Exhibit 15F.  The attorney then withdrew his request.  (Tr. 53-54.)

requirements of a deemed-disabling impairment as listed in the Commissioner's regulations. (Tr. 10.)

The ALJ then found that Plaintiff had the RFC to lift ten pounds, stand or walk two hours out of an eight-hour workday, and sit six hours out of an eight-hour workday, alternating every thirty minutes between sitting and standing positions to relieve her pain. The ALJ found that Plaintiff could never climb ropes, ladders, or scaffolds; must avoid concentrated exposure to vibration, industrial hazards and unprotected heights; but that she could occasionally climb ramps and stairs, as well as balance, stoop, kneel, crouch, and crawl. In addition, the ALJ determined that Plaintiff was limited to no more than "frequent fingering with her upper extremities," work requiring no more than simple one- or two-step instructions, and no more than occasional contact with the general public. (Tr. 12.)

The ALJ noted that in making his RFC determination, he considered all of Plaintiff's symptoms and the extent to which these symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence, as well as opinion evidence, in accordance with the applicable regulatory requirements. In further support of his RFC, the ALJ noted that Plaintiff last worked just before the start of her maternity leave and attempted to return to her old job after the birth of her son. The ALJ noted that Plaintiff was unable to return to her old position, was offered and declined a different, lower-paying part-time job, and unsuccessfully sought other work. (Tr. 12.)

In considering Plaintiff's physical impairments, the ALJ noted that Plaintiff's

herniated lumbar disc significantly limits her exertional capacity.  The ALJ then noted that Plaintiff claimed she had to elevate her legs for eight hours per day due to thrombophlebitis in her legs.  The condition had not required any recent treatment but allegedly caused blood clots from fourteen to twenty days per month and unrelated ankle swelling.  The ALJ also considered Plaintiff's allegations of carpal tunnel syndrome, asthma and frequent headaches.  (Tr. 13.)

The ALJ determined that Plaintiff was able to act as the primary caretaker for her children despite her alleged impairments, although she did require occasional help.  The ALJ also noted that despite her alleged mental impairments and reported symptoms of frequent crying, panic attacks, racing thoughts, and disliking crowds, Plaintiff had been able to work successfully for eight years in the pharmacy at a large retail store.  (Tr. 13.)

The ALJ next determined that Plaintiff's allegations that her disability began on August 30, 2007, were inconsistent with records that indicated her impairments began as early as 2005 and had persisted for years prior to that date.  The ALJ noted that these impairments, which Plaintiff now claimed made her unable to work, had not prevented her from working prior to August 30, 2007.  The ALJ pointed out that although Plaintiff had undergone surgery related to those impairments on September 15, 2006, she continued to work until August 30, 2007.  (Tr. 13.)

Recognizing that surgery generally underscores a significant impairment, the ALJ noted that the post-surgery records in this case indicated that the surgery successfully relieved Plaintiff's symptoms and that one month later Plaintiff was doing well and had

17

no complaints.  The ALJ pointed out that in June, 2007, Plaintiff experienced venous insufficiency, varicosities and spider veins, impairments that commonly occur during pregnancy, and that on September 6, 2007, after giving birth, Plaintiff had another surgical procedure, that again relieved her symptoms.[11]  The ALJ further noted that on December 13, 2007, Dr. Adams reported that the surgical wound looked "closed and good," and although Dr. Adams encouraged Plaintiff to call if her condition worsened, she did not.  The ALJ opined that Plaintiff had not needed additional treatment because her previous surgeries had successfully relieved her symptoms.  The ALJ therefore determined that these impairments no longer resulted in significant limitations.  (Tr. 13.)

Next, the ALJ determined Plaintiff's facet arthritis of the lumbar spine was not a significant impairment, but rather consistent with someone of Plaintiff's age and "body habitus."  The ALJ noted that Plaintiff had full extremity strength and range of motion, and that a later EMG failed to indicate cervical radiculopathy.  The ALJ further noted that Plaintiff had not sought aggressive treatment for her back problems, nor was she encouraged by her doctor to do so.  The ALJ determined that this evidence failed to support Plaintiff's allegations that her spinal impairments were disabling.  (13-14).

The ALJ also found that Plaintiff's carpal tunnel syndrome had not persisted for a

---

[11]    The Court reads the record to reflect that September 6, 2007, was merely a Venous Doppler examination and diagnosis completed by Dr. Pritchard.  As noted above in footnote 1, notes on Plaintiff's Wound Treatment form, completed by Dr. Adams on December 13, 2007, indicated a surgery had occurred without mentioning specific details. The Court does not find any medical report in the record from this surgical procedure. (Tr. 277, 351.)

period of twelve months, had not required surgery, and was therefore not disabling.  In addition, the ALJ determined that Plaintiff's testimony that she had asthma was not supported by medical observations or testing in the record.  The ALJ further concluded that the results of  Plaintiff's October 14, 2008 neurology consultation did not indicate an objective basis for Plaintiff's alleged headaches and did not therefore support a finding of disability.  (Tr. 13-14.)

The ALJ considered Plaintiff's obesity, noting that there was no persuasive evidence that it "caused reduced respiratory capacity, skin disorders, edema, huge calluses on her feet or coronary artery disease."  The ALJ went on to note that Plaintiff's treating physician had not reported that Plaintiff's "obesity result[ed] in severe symptoms and limitations of function, for [twelve] consecutive months in duration, despite compliance with treatment."  (Tr. 14.)

With respect to Plaintiff's mental impairments, the ALJ first noted that Plaintiff had not alleged any mental impairments in her initial applications.  The ALJ considered the notes of Plaintiff's primary care physician, Dr. Grgurich, who had prescribed Prozac for Plaintiff's reports of anxiety and depression.  He noted that after initially refusing treatment, Plaintiff saw a counselor, to whom Plaintiff reported long-term mental impairments.  The ALJ concluded that the absence of documentation of consistently limiting symptoms, the lack of a long-term history of problems or treatment, and the temporary nature of Plaintiff's mental health complaints, related specifically to difficulty coping with the loss of a  job and a relationship, undermined Plaintiff's allegations that

her mental impairments were part of a disabling combination of impairments. Rather, the ALJ found that Plaintiff's mental condition reflected recent adverse occurrences rather than a chronic or long-lasting mental impairment. (Tr. 15.)

The ALJ also considered Dr. Harden's December 23, 2008 mental status examination where Plaintiff reported not only a twenty year history of depression, but also that she regularly performed a substantial number of activities of daily living. The ALJ found Plaintiff's ability to perform these activities inconsistent with allegations of a disabling mental impairment. The ALJ further noted Dr. Harden's observations that Plaintiff had satisfactory grooming, logical thought processes, intact concentration, was fully oriented to person, place, and time and did not report hallucinations, delusions, or suicidal thoughts. Having considered Dr. Harden's observations and clinical findings, the ALJ found Dr. Harden's opinion unpersuasive because he had not treated Plaintiff prior to this assessment, and because neither Plaintiff's primary physician nor her counselor recommended or noted any restrictions of her activities or her ability to work. In addition, the ALJ found that Dr. Harden provided little explanation or support for his opinion, relying solely on Plaintiff's subjective reports. Finally, the ALJ determined that Dr. Harden's GAF assessment was inconsistent with the longitudinal medical evidence of Plaintiff's mental impairments for twelve continuous months and the medical record as a whole. (Tr. 16-17.)

At step five, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms;

however, he determined that Plaintiff's statements regarding the intensity, persistence, and limiting effects of those symptoms were not fully supported by the medical record and were credible only to the extent they were consistent with the RFC determination. (Tr. 17.)

Next, the ALJ determined that Plaintiff was unable to perform any past relevant work; was at forty-three, a younger individual age eighteen to forty-four; had at least a high school education; was able to communicate in English; and had no transferable skills. (Tr. 17.)

The ALJ found credible the VE's testimony that jobs such as "assembler," "packager," and "stuffer," consistent with the limitations specified for a person of Plaintiff's age, education, work experience, and residual functional capacity, existed in significant numbers in the national economy, and determined that Plaintiff was capable of making a successful adjustment to such other work. Therefore, the ALJ found Plaintiff "not disabled" from August 30, 2007, through June 26, 2009, the date of his decision. (Tr. 18.)

## DISCUSSION

### Standard of Review and Statutory Framework

In considering the denial of Social Security disability benefits, a court "must review the entire administrative record to 'determine whether the ALJ's findings are supported by substantial evidence on the record as a whole." *Johnson v. Astrue*, 628 F.3d 991, 992 (8th Cir. 2011). A court "may not reverse . . . merely because substantial

evidence would support a contrary outcome. Substantial evidence is that which a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation omitted); *see also Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (explaining that the concept of substantial evidence allows for the possibility of drawing two inconsistent conclusions, and therefore, embodies a "zone of choice," within which the Commissioner may decide to grant or deny benefits without being subject to reversal by the reviewing court).

To be entitled to benefits, a claimant must demonstrate an inability to engage in substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner determines whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment or combination of impairments is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling

impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work. If so, the claimant is not disabled. If she cannot perform her past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform work that is available in the national economy and that is consistent with the claimant's vocational factors. *Phillips v. Astrue*, 671 F.3d 699, 701-02 (8th Cir. 2012).

## A.    Substantial Evidence Supports the ALJ's RFC Determination

Plaintiff asserts that the RFC determination is not supported by the record. Specifically, Plaintiff contends that, in making his RFC determination, the ALJ improperly discounted Plaintiff's testimony, failed to consider the written testimony of her daughter, failed to consider the effect of obesity on her other impairments, and failed to give proper weight to the opinion of Dr. Harden, a consulting physician.

The RFC represents the most a claimant can do despite the combined effects of her credible limitations, and reflects her ability to perform work activity on a regular and continuing basis. *See* 20 C.F.R. §§ 404.1545, 416.945. The responsibility for assessing RFC lies with the ALJ, and the assessment should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" *Krogmeier v. Barnhart*, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)); *see also* 20 C.F.R. §§ 416.927(a), 416.946(c).

A claimant's RFC is the most an individual can do despite the combined effects of her credible limitations. 20 C.F.R. § 404.1545.

## 1. Credibility of Plaintiff's Subjective Complaints

In arriving at an RFC determination, an ALJ also must determine whether the claimant's description of her impairments is credible in light of the factors identified in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Under *Polaski,* the relevant considerations are: "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Renstrom v. Astrue,* 680 F.3d 1057, 1065-66 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009)).

"The ALJ is not required to discuss methodically each *Polaski* consideration, so long as he acknowledge[s] and examine[s] those considerations before discounting a claimant's subjective complaints." *Partee v. Astrue*, 638 F.3d 860, 865 (8th Cir. 2011) (internal quotation omitted). Because the ALJ gave good reasons for discounting Plaintiff's credibility, and those reasons find support in the record, the Court will defer to the ALJ's credibility determinations. *See Perkins v. Astrue*, 648 F.3d 892, 900 (8th Cir. 2011) ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.") (internal quotation marks and citation omitted).

The ALJ properly considered the inconsistencies between Plaintiff's subjective complaints and her reported activities of daily living, noting that these activities were "not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. 11.) The fact that Plaintiff left her last employment due to factors unrelated to her alleged disabilities, having last worked on August 30, 2007, the day before she gave birth to her son and began her maternity leave, also provides a basis for the ALJ's determination that plaintiff's subjective complaints were not credible. (Tr. 8, 17, 25, 128.) *See Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005) (noting that "[c]ourts have found it relevant to credibility when a claimant leaves work for reasons other than her medical condition"). Further, Plaintiff's own testimony established that she intended to return to work, and tried to do so, but that other, nonmedical factors unrelated to her claims of disability frustrated this plan. (Tr. 25-26.) *See* 20 C.F.R. §§ 404.1566(c), 416.966(c) ("We will determine that you are not disabled if your residual functional capacity and vocational abilities make it possible for you to do work which exists in the national economy, but you remain unemployed because of . . . [y]our inability to get work.").

In addition, the ALJ properly noted that Plaintiff had worked for several years while experiencing the alleged impairments, and that she failed to offer evidence that these impairments had worsened significantly just prior to or after the alleged date for onset of disability. *See Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011) (noting that a condition "that was not disabling during working years and has not worsened cannot be

used to prove present disability") (citation omitted); *Naber v. Shalala,* 22 F.3d 186, 189 (8th Cir. 1994). Finally, the ALJ's finding that Plaintiff received relatively conservative medical treatment and did not seek additional treatment, forms an appropriate basis for discounting the credibility of her complaints of disabling pain. (Tr. 14.) *See Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001) (holding that an ALJ may properly consider a claimant's failure to make significant efforts to seek medical treatment to alleviate alleged pain).

### 2.    Testimony of Plaintiff's Daughter

Plaintiff also asserts that the ALJ erred by failing to mention and consider the written testimony of her daughter. (Doc. No. 13-7, 8E.) That written testimony is largely consistent with Plaintiff's own testimony, recounting Plaintiff's alleged physical and mental impairments, and her daughter's opinion that Plaintiff is unable to work.

"While it is preferable that the ALJ delineate specific credibility determinations for each witness, an arguable deficiency in opinion-writing technique does not require [the Court] to set aside an administrative finding when that deficiency has no bearing on the outcome." *Buckner v. Astrue,* 646 F.3d 549, 559 (8th Cir. 2011) (quoting *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992)).

The record[12] establishes that the ALJ considered the testimony of Plaintiff's daughter, but that he did not specifically outline his reasons for rejecting that testimony.

---

[12]    In his opinion, the ALJ stated: "[t]he [Plaintiff's] file contains numerous third party statements. These have been considered." (Tr. 8.)

Although explicit findings concerning the credibility of and weight given to the testimony of each witness are preferable, the absence of such specific findings does not require reversal. *Buckner,* 646 F.3d at 559. The ALJ's failure to make explicit his reasons for discounting a third party's testimony are not fatal where, as here, the same evidence that the ALJ referred to in discrediting Plaintiff's claims also discredits her daughter's claims. *Id.*; *see also Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir.1995); *Robinson*, 956 F.2d at 841.

### 3.    The ALJ Properly Discounted the Opinion of Dr. Harden

Plaintiff asserts that the ALJ failed to give proper weight to the opinion of Dr. Harden, the consulting physician to whom Plaintiff was referred for a consultative evaluation in conjunction with her application for Medicaid services. Dr. Harden's diagnostic impressions included recurrent major depressive disorder, posttraumatic stress disorder, and dependent personality traits. (Tr. 388.) He assigned Plaintiff a GAF score of 50. Dr. Harden concluded that Plaintiff had an inadequately treated major depressive disorder and that she appeared to be in need of ongoing psychiatric care including psycho pharmacologic treatment and ongoing counseling. (Tr. 386-88.)

A number of factors, including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area govern the weight properly accorded a medical opinion. *See* 20 C.F.R. § 404.1527(c). The ALJ must give controlling weight to the opinion of a treating medical source as to the

nature and severity of an impairment, if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Id.* § 404.1527(c)(2). The opinions of consultative physicians such as Dr. Harden are generally given less weight due to the absence of a long term treatment relationship and the isolated nature of the examination. *See Teague v. Astrue*, 638 F.3d 611, 615 (8th Cir. 2011) (finding that "[a] single evaluation by a non-treating psychologist is generally not entitled to controlling weight"); *Wagner v. Astrue*, 499 F.3d 842, 849 (8th Cir. 2007) (the opinion of a consulting physician who examined Plaintiff only once or not at all does not constitute substantial evidence) (citation omitted).

In this case, the ALJ properly discounted Dr. Harden's opinion due to his lack of previous and ongoing contact with Plaintiff. (Tr. 16.) *Wagner*, 499 F.3d at 849. In addition, the ALJ noted and the Court agrees that Dr. Harden's findings, including the GAF score he assigned, were inconsistent with the "longitudinal medical evidence." The ALJ noted that Dr. Harden had never treated Plaintiff prior to assigning the GAF score nor did he have an ongoing relationship with Plaintiff. In addition to the fact that Harden saw the claimant only once, the ALJ found that the medical records indicated less significant symptoms than those implicit in a GAF of 50. The ALJ also noted that the observations of Mr. Mozingo, the counselor who treated Plaintiff for a longer period of time, were inconsistent with significant mental impairments and with Hardens' findings. Mr. Mozingo found many of Plaintiff's mental symptoms related to short term problems,

including job loss and relationship difficulty. He also noted a cooperative attitude, average intelligence, good grooming and intact insight and judgment, all characteristics which the ALJ found inconsistent with long term significant mental impairment. (Tr. 15-16.) *See Perkins v. Astrue*, 648 F.3d 892, 897-98 (8th Cir. 2011) (holding that an ALJ may discount a medical opinion where other medial assessments are supported by more through medical evidence); *see also Choate v. Barnhart*, 457 F.3d 865, 869 (8th Cir. 2006) (holding that medical opinions are not, in any case, "automatically controlling," because the record must be evaluated as a whole").

## B.    The ALJ Properly Considered the Effect of Plaintiff's Obesity

Plaintiff asserts that the ALJ failed to consider the effect of her obesity[13] and whether it exacerbated her impairments of herniated disc, arthritic changes in her back, and pain in her ankle. Upon review of the record the Court finds that the ALJ explicitly referenced Plaintiff's obesity and its possible effect on her other limitations and alleged impairments. (Tr. 14.) Although Plaintiff demonstrated evidence of obesity as a medically determinable impairment, she failed to demonstrate that this impairment, either alone or in combination with other impairments, limited her capacity for basic work-related activities as defined in 20 C.F.R. §§ 404.1521(b), 416.921(b) (defining "basic work activities" as those abilities and aptitudes necessary to do most jobs). As the ALJ

---

[13]    During the relevant period, Plaintiff's height was 66 inches and her weight ranged between 223 and 248 pounds. (Tr. 129.) Plaintiff therefore had a body mass index (BMI) between 36 and 40, well within the range for obesity.

noted, the record does not support Plaintiff's contention that her obesity caused "reduced respiratory capacity, skin disorder, edema, huge calluses on her feet, or coronary artery disease." (Tr. 14.) Moreover, in her disability reports, Plaintiff alleged that a variety of problems associated with her legs limited her ability to work. (Tr. 130.) While she testified at length about the difficulties she had with work-related activities, she did not report that her weight was the cause of any functional limitation. Therefore, the record indicates that the ALJ considered Plaintiff's obesity, but found no evidence that her obesity alone or in combination with other impairments rendered her disabled. *See Martise*, 641 F.3d at 924 (finding that the ALJ properly considered whether impairments in combination were disabling by separately discussing each impairment and assessing, affective disorder, and complaints of pain, as well as her daily level of activities); *Heino v. Astrue*, 578 F.3d 873, 881-82 (8th Cir. 2009) (quotation omitted) (holding that where the ALJ "specifically referred" to the claimant's obesity, such consideration is sufficient to avoid reversal).

**C.    The VE's Opinion and the Third Hypothetical Question**

Plaintiff also contends that the ALJ erred in failing to give sufficient weight to the VE's response to the third hypothetical question posed by the ALJ. In that hypothetical the ALJ asked the VE to consider an individual who needed occasional, unscheduled breaks during the workday, needed to lie down for extended periods of time due to medication side effects, experienced an inability to concentrate, and had periods of decompensation. The VE opined that such an individual would not be employable.

Plaintiff argues that the ALJ erred by failing to rely on the VE's opinion in this regard and asserts that the medical evidence on the record supports a finding that she has each of the limitations set forth in the third hypothetical.

When a claimant establishes that she can no longer perform her past work, the burden shifts to the Commissioner to establish that other jobs exist that the claimant can perform considering the claimant's impairments and vocational factors. 20 C.F.R. § 404.1560(c)(2). If nonexertional limitations are at issue, the Commissioner must solicit testimony from a VE to establish whether there are jobs in the national economy that the claimant can perform. The hypothetical question posed to the VE is "sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true." *Goff v. Barnhardt*, 421 F.3d 785, 794 (8th Cir. 2005) (internal quotations omitted); *Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988). Where a hypothetical question precisely sets forth all of the claimant's physical and mental impairments, a VE's testimony constitutes substantial evidence in support of the ALJ's decision. *Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008). However, "[t]he ALJ's hypothetical question to the vocational expert needs to include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Martise,* 641 F.3d at 927 (citation omitted). Just as "the ALJ was not obligated to include limitations from opinions he properly disregarded," he could not rely upon a hypothetical that included limitations unsupported by the record. *Wildman v. Astrue*, 596 F.3d 959, 969 (8th Cir. 2010).

Here the second hypothetical propounded by the ALJ summarized the limitations

that the ALJ found credible and were supported by the record.  He properly relied on the VE's response to this hypothetical in determining that there were jobs in the national economy which Plaintiff could perform.  (Tr. 18).  By contrast, the ALJ's third hypothetical included not only limitations that the ALJ found substantially supported by the record as a whole but also limitations (specifically, the need for occasional, unscheduled breaks during the workday and to lie down for extended periods of time due to medication side effects, an inability to concentrate, and periods of decompensation) that the ALJ did not find supported by the record.  Therefore, the third hypothetical contained elements unsupported by substantial evidence, and the ALJ was not required to rely on the VE's response to that hypothetical in reaching his determination.  *See Buckner*, 646 F.3d at 561(holding that VE's testimony constitutes substantial evidence only when it is based on hypothetical that accounts for proven impairments); *Renstrom v. Astrue*, 680 F.3d at 1067-68 (same).

## CONCLUSION

In accordance with applicable statutes and regulations, Plaintiff had a fair hearing and received full administrative consideration of her applications for disability insurance benefits and SSI, under Titles II and XVI of the Social Security Act, respectively, 42 U.S.C. §§401-434 and §§1381-1383(f).  Substantial evidence on the record as a whole supports the Commissioner's decision regarding Plaintiff's application.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is

**AFFIRMED.**

A separate Judgment shall accompany this Memorandum and Order.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 11th day of September, 2012.